[No. S106256. Aug. 18, 2003.]

ALLEN HASSAN, Plaintiff and Appellant, v.
MERCY AMERICAN RIVER HOSPITAL, Defendant and Respondent.

## COUNSEL

The Advani Law Firm, Kelly, Herlihy, Advani & Klein, The Schinner Law Group, Law Offices of Mukesh Advani, Mukesh Advani, Jerry Schreibstein and R. David Bolls III for Plaintiff and Appellant.

Diepenbrock, Wulff, Plant & Hannegan, Sean O. Sheridan, John A. Bachman; Riegels, Campos & Kenyon and Charity Kenyon for Defendant and Respondent.

Catherine I. Hansen and Gregory M. Abrams for California Medical Association, California Dental Association and California Healthcare Association as Amici Curie on behalf of Defendant and Respondent.

## OPINION

**KENNARD, J.**—Civil Code section 43.8[1] confers a privilege on "any person" who makes a communication "to any hospital [or] hospital medical staff . . . when the communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing or veterinary arts."

We must answer two related questions. First, is the statutory term "person" limited to humans, or does it also include entities? Second, is the privilege absolute or only qualified? We conclude that the privilege applies to entities, and that the privilege is qualified. Because this is consistent with the Court of Appeal's decision, we affirm that court's judgment.

---

[1] All further statutory references are to the Civil Code.

## I

We recite the facts as set out in the record before the trial court when it granted defendant's motion for summary judgment. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65–66 [99 Cal.Rptr.2d 316, 5 P.3d 874].)

From 1970 to 1986, plaintiff Allen Hassan was a member of the medical staff of defendant Mercy American River Hospital (Mercy). In September 1993, he applied for medical staff privileges at Roseville Community Hospital (Roseville). Roseville then sent Mercy a letter asking for information about plaintiff, including Mercy's "[k]nowledge of past clinical performance noting anything that warrants exercising caution in granting clinical privileges," and "verification . . . of [plaintiff's] residency in psychiatry/neurology at Mendocino State Hospital."

Mercy's written response to Roseville, in December 1993, included "copies of letters received concerning [plaintiff's] residency" and a copy of a memorandum summarizing a telephone conversation on January 14, 1970, during which the then associate medical director of Mendocino State Hospital (Mendocino), in a conversation with Mercy's then medical director, had reportedly described plaintiff as " 'MILITANT' vs. authority," tending "to identify with the underdog," "too personally involved with problems of the misfortunate or oppressed (Arabs esp.)," and a " 'MANIPULATOR' of coworkers and supervisors."

In May 1994, Roseville rejected plaintiff's application for staff privileges in part because of "[n]egative recommendations from other hospitals," including his "resignation from [the] psychiatry program at Mendocino." Plaintiff sought reconsideration of Roseville's decision, and eventually he entered into a settlement agreement under which he withdrew his application for active staff membership and Roseville admitted him under the category of "Active Physicians with Limited Hospital Privileges."

In June 1995, plaintiff sued Mercy, asserting causes of action for defamation, intentional interference with prospective business advantage, and negligent interference with an economic relationship, all based on the January 1970 telephone conversation memorandum that Mercy forwarded to Roseville.

In November 1996, Mercy moved for summary judgment, asserting that its communication to Roseville was privileged under section 43.8, which confers immunity on communications to a hospital that is evaluating a medical practitioner. Plaintiff opposed the motion, alleging that the staff member who forwarded the memorandum to Roseville did so out of ill will because he had

not gotten along with plaintiff. Plaintiff described the memorandum as "devoid of any significance 'to aid the evaluation of [his] qualifications, fitness, character, or insurability,' " because it was based on personal observations made some 26 years earlier, was "rife with speculation," and reflected "racism and inherent bias."

The trial court granted Mercy's motion for summary judgment. Relying on *Johnson v. Superior Court* (1994) 25 Cal.App.4th 1564 [31 Cal.Rptr.2d 199] (*Johnson*), the trial court found that Mercy's correspondence to Roseville was absolutely privileged under section 43.8. Plaintiff appealed.

The Court of Appeal affirmed the judgment. It agreed with the trial court that entities like Mercy could invoke the section 43.8 privilege, but it concluded that the privilege was qualified, not absolute. Nonetheless, it determined that the trial court properly granted summary judgment because Mercy's moving papers in support of summary judgment had established the conditions necessary for Mercy to claim the privilege and plaintiff's opposition papers had failed to raise a triable issue of fact on the issue of malice.

We granted plaintiff's petition for review to resolve conflicts among the Courts of Appeal over whether the term "person," as used in section 43.8, includes entities, and whether the Legislature intended that section to provide an absolute or a qualified privilege.

## II

As noted at the outset, section 43.8 confers a privilege on "any person" who makes a communication to "any hospital" if the communication was "intended to aid" in evaluating a medical practitioner's "qualifications, fitness, character, or insurability." We consider first whether "any person" in this provision includes entities like defendant Mercy.

■ Well-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law. (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069].) We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. (*People v. Trevino* (2001) 26 Cal.4th 237, 241 [109 Cal.Rptr.2d 567, 27 P.3d 283].) The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. (*Ibid.*; see also *Trope v. Katz* (1995) 11 Cal.4th 274, 282 [45 Cal.Rptr.2d 241, 902 P.2d 259]; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570–571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) These canons generally preclude judicial construction

that renders part of the statute "meaningless or inoperative." (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 274 [41 Cal.Rptr.2d 220, 895 P.2d 56].) In addition, words should be given the same meaning throughout a code unless the Legislature has indicated otherwise. (*People v. Roberge* (2003) 29 Cal.4th 979, 987 [129 Cal.Rptr.2d 861, 62 P.3d 97]; see also *Department of Revenue of Ore. v. ACF Industries, Inc.* (1994) 510 U.S. 332, 342 [127 L.Ed.2d 165, 114 S.Ct. 843]; *People v. Nguyen* (1999) 21 Cal.4th 197, 205 [87 Cal.Rptr.2d 198, 980 P.2d 905]; *State of California v. Texaco* (1988) 46 Cal.3d 1147, 1162 [252 Cal.Rptr. 221, 762 P.2d 385].)

Section 43.8 states, in pertinent part, that "no cause of action for damages shall arise against, *any person* . . . ." (Italics added.) Section 43.8 does not define the word "person," but section 14, which defines certain words used in the Civil Code, states that "the word person includes a corporation as well as a natural person." And this court long ago recognized that "person" in the Civil Code may include "public or private corporations, or natural person[s]." (*City of Pasadena v. Stimson* (1891) 91 Cal. 238, 248 [27 P. 604].)

Plaintiff urges us to limit "person" in section 43.8 to humans. In support, he cites *Axline v. Saint John's Hospital and Health Center* (1998) 63 Cal.App.4th 907 [74 Cal.Rptr.2d 385] (*Axline*), in which a doctor sued a hospital after it had denied his application to join its medical staff. In rejecting the hospital's claim of privilege under section 43.8, the Court of Appeal said that, "[g]iven the express language [of section 43.8], *the Hospital does not explain how it can fall within the definition of 'any person.' "* (*Axline, supra,* at p. 913, italics added.)

The Court of Appeal here characterized that statement as "offhand specula-tion," apparently because the *Axline* court did not undertake an analysis of section 43.8's text or legislative history to determine whether entities could claim the privilege. Moreover, it viewed the statement as mere dictum because it was not necessary for the resolution of the case. In *Axline*, the doctor had challenged the *procedures* the hospital had used in processing his application rather than, as here, a *communication* between two hospitals about a doctor's competence and character. Consequently, the *Axline* court con-cluded that section 43.8's privilege was "not triggered" because "the alleged misconduct does not relate to the communication of information to a hospi-tal." (*Axline, supra,* 63 Cal.App.4th at p. 913.) Because the *Axline* court's suggestion that a hospital was not a person within the meaning of the term used in section 43.8 was a "comment . . . made in passing, . . . unnecessary to resolve the issue in that case" (*Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1028 [130 Cal.Rptr.2d 662, 63 P.3d 220]), we agree with the Court of Appeal here that it was "mere dictum, thus lacking in precedential force" (*ibid*).

It is not disputed that defendant Mercy is a corporation and thus falls within section 14's definition of a person. Nonetheless, plaintiff insists that we must consider whether the term "person" includes noncorporate entities because, he asserts, some health care providers, such as nursing homes, are organized as noncorporate entities. Plaintiff argues that applying section 14's definition of "person" to section 43.8 would limit section 43.8's privilege to natural persons and corporations, leading to an "absurd" result in which a medical provider organized as a corporation could claim the privilege but a medical provider organized in another way could not. We disagree with the premise of this argument.

■ Section 14's definition of "person" as *including* corporations does not necessarily limit section 43.8's privilege to natural persons and corporations. As this court has affirmed, the word "including" in a statute is "ordinarily a term of enlargement rather than limitation." (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1101 [17 Cal.Rptr.2d 594, 847 P.2d 560]; accord, *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774 [117 Cal.Rptr.2d 574, 41 P.3d 575].) Applying this general principle, the Court of Appeal in *Oil Workers Int'l Union v. Superior Court* (1951) 103 Cal.App.2d 512, 570 [230 P.2d 71], held that, for purposes of the statutes governing contempt, an unincorporated association was a person as defined in Code of Civil Procedure section 17, which, like Civil Code section 14, states that "the word 'person' *includes* a corporation as well as a natural person." (Italics added.) The court reasoned that whether the term "person" in a provision of the Code of Civil Procedure includes a corporation or a noncorporate entity is ultimately a question of legislative intent. (See also *Diamond View Limited v. Herz* (1986) 180 Cal.App.3d 612, 617–618 & fn. 6 [225 Cal.Rptr. 651] [relying on evidence of legislative intent to conclude that a limited partnership is not a person under Code Civ. Proc., § 527.6].)

The legislative history of section 43.8 strongly indicates that the Legislature did not intend to limit the privilege to natural persons, and it contains no indication that an entity could claim the privilege only if it was organized as a corporation. Referring to the bill that enacted section 43.8, a legislative committee staff analysis, which may be considered in determining legislative intent (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513]), stated that "it is the intent of the legislation that 'person' include natural and unnatural individuals." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 3633 (1973–1974 Reg. Sess.) p. 2.)[2] Additionally, the Legislature could have expressly excluded all hospitals from the privilege, as it has done in other provisions granting immunity

---

[2] We have taken judicial notice of documents in the legislative record for Assembly Bill No. 3633 (1973–1974 Reg. Sess.), the bill by which section 43.8 was enacted. (Stats. 1974, ch. 1086, § 1, p. 2313.)

from tort liability (e.g., § 43.7 ["This section shall not be construed to confer immunity from liability on any . . . hospital."]), but it did not do so. ■ Thus, neither the language nor the history of section 43.8 supports the narrow definition of "person" advanced by plaintiff.

■For these reasons, we conclude that "person" in section 43.8 includes entities as well as humans.[3]

## III

We now consider whether communications protected under section 43.8 are absolutely privileged or only qualifiedly privileged.

■ California law recognizes two forms of privilege for communications: "An 'absolute' privilege excludes liability for a publication notwithstanding that it is made with actual malice, whereas a 'qualified' or 'conditional' privilege does not protect a defendant who has acted maliciously." (*Saroyan v. Burkett* (1962) 57 Cal.2d 706, 708 [21 Cal.Rptr. 557, 371 P.2d 293]; accord, *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 912 [120 Cal.Rptr.2d 576].) In the context of communication privileges, malice has been described as "a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 944 [160 Cal.Rptr. 141, 603 P.2d 58]; accord, *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1204 [31 Cal.Rptr.2d 776, 875 P.2d 1279]; *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 723 [257 Cal.Rptr. 708, 771 P.2d 406].) Traditionally, malice has included not only deliberate falsehoods but also false statements made without reasonable grounds to believe them true. (*Kashian v. Harriman, supra,* at p. 931; see also *Frommoethelydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208, 217 [228 Cal.Rptr. 160, 721 P.2d 41]; *Dorn v. Mendelzon* (1987) 196 Cal.App.3d 933, 945 [242 Cal.Rptr. 259].) With qualified privileges, the defendant bears the "initial burden of demonstrating that the allegedly defamatory communication was made upon a privileged occasion, and the plaintiff then [bears] the burden of proving that defendant . . . made the statement with malice." (*Lundquist v. Reusser, supra,* at p. 1208; *Dorn v. Mendelzon, supra,* at pp. 944–945; *Williams v. Taylor* (1982) 129 Cal.App.3d 745, 752 [181 Cal.Rptr. 423].)

The trial court here granted defendant Mercy's summary judgment motion because it found Mercy's communication to Roseville about plaintiff's competence and character to be absolutely privileged under section 43.8. The

---

[3] To the extent it is inconsistent with this conclusion, the decision in *Axline v. Saint Joseph's Hospital and Health Center, supra,* 63 Cal.App.4th 907, is disapproved.

Court of Appeal majority disagreed that section 43.8 confers an absolute privilege. In its view, a party may defeat the privilege with proof that the communicator knew the information to be either false or patently irrelevant, although it also concluded that plaintiff presented no such evidence here. On the other hand, the concurring Court of Appeal justice agreed with the trial court that the section 43.8 privilege is absolute "even in the circumstance where [the communicator] lied, or knew the information he conveyed did not bear on that evaluation."

As originally enacted in 1974, the section 43.8 privilege was qualified rather than absolute. (See *Hackethal v. Weissbein* (1979) 24 Cal.3d 55, 60 [154 Cal.Rptr. 423, 592 P.2d 1175]; *Dorn v. Mendelzon, supra,* 196 Cal.App.3d at p. 943; see also *Moore v. Conliffe* (1994) 7 Cal.4th 634, 671 [29 Cal.Rptr.2d 152, 871 P.2d 204] (dis. opn. of Baxter, J.).) Before it was amended in 1990, section 43.8 read: "[T]here shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person on account of the communication of information in the possession of such person to any hospital [or] hospital medical staff . . . when such communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing or veterinary arts *and does not represent as true any matter not reasonably believed to be true.*" (As amended by Stats. 1983, ch. 1081, § 2, pp. 3864–3865, italics added.) Thus, before the 1990 amendment, the privilege was expressly conditioned on the communicator's reasonable belief in the truth of the information conveyed. The 1990 amendment removed the above italicized language expressly imposing this condition. (Stats. 1990, ch. 1597, § 30, p. 7697.)

We must decide whether, by removing from section 43.8 the words "and does not represent as true any matter not reasonably believed to be true," the Legislature intended to make the privilege absolute, or whether the privilege is still qualified in light of the remaining requirement that the communication must have been "intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner . . . ." This court has not previously considered this issue, although a footnote in a decision of this court characterized section 43.8 as affording "absolute immunity." (*Alexander v. Superior Court* (1993) 5 Cal.4th 1218, 1225, fn. 6 [23 Cal.Rptr.2d 397, 859 P.2d 96]; see also *Axline, supra,* 63 Cal.App.4th at p. 913 [stating that section 43.8 "provides absolute immunity"].)

In concluding that the section 43.8 privilege is now absolute, the trial court here relied on *Johnson, supra,* 25 Cal.App.4th 1564, in which the plaintiff doctor brought a malicious prosecution action against individuals who had acted as expert consultants in disciplinary hearings against the plaintiff.

(*Id.*, at p. 1570.) The trial court overruled the defendants' demurrer, finding that the section 43.8 privilege was qualified. The Court of Appeal disagreed, holding that "section 43.8 affords [the defendant expert consultants] a complete defense." (*Johnson, supra,* at p. 1567.) The court relied primarily upon the Legislature's statement of purpose for the 1990 legislation that included the amendment of section 43.8. The Legislature declared that the Judicial Procedure Improvement Act, of which the 1990 amendment of section 43.8 was a small part, was intended to "restructure the physician discipline system of the Medical Board of California in order to give it authority to act quickly in extreme cases to impose interim protective measures . . . [and to give it] more information from a variety of enhanced reporting sources and increased public outreach." (Stats. 1990, ch. 1597, § 1, p. 7683.) From this broad statement of intent, the Court of Appeal in *Johnson* inferred that "the Legislature intended to make the immunity . . . absolute rather than conditional." (*Johnson, supra,* at p. 1569.)

The Court of Appeal majority here rejected that conclusion as being inconsistent with the text of section 43.8, which continues to require that the communication be "intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner." ■ We agree with the Court of Appeal that the privilege remains qualified rather than absolute, and that a plaintiff may defeat a claim of privilege under section 43.8 by proving that the communicator knew the information was false or otherwise lacked a good faith intent to aid in the evaluation of the practitioner.

■ To determine the legislative intent, we begin with the language of the statute, giving the words their ordinary and usual meaning. (*People v. Trevino, supra,* 26 Cal.4th at p. 241.) The word "intended" ordinarily refers to a subjective mental state. As this court has stated: "To 'intend' means to have in mind as a purpose or goal." (*People v. Osband* (1996) 13 Cal.4th 622, 681 [55 Cal.Rptr.2d 26, 919 P.2d 640]; see also *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 17 [44 Cal.Rptr.2d 370, 900 P.2d 619] [whether injury or damage is "expected or intended" under an insurance policy is determined by reference to the insured's subjective mental state].) The word "aid" ordinarily means to assist or help. (*People v. Ott* (1978) 84 Cal.App.3d 118, 129 [148 Cal.Rptr. 479]; *People v. Ellhamer* (1962) 199 Cal.App.2d 777, 781 [18 Cal.Rptr. 905]; Webster's New World Dict. (2d college ed. 1982) p. 28.) Therefore, a communication is "intended to aid" in the evaluation of a medical practitioner when the communicator acts with a subjective purpose or goal to help or assist in the evaluation.

The concurring justice in the Court of Appeal suggested that the phrase "intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner" did not refer to the subjective goal or purpose

of the communicator, but instead referred merely to the environment or context in which the communication was made. But this construction would not be consistent with the ordinary meaning of these words, as we have explained. Had the Legislature meant to refer merely to the context of the communication, it could have manifested that intent by providing that the privilege would apply to any communication "used" or "submitted for use" or "intended for use" in the evaluation of a medical practitioner. By providing instead that the privilege applied only to communications "intended to aid" in the evaluation, the Legislature manifested an intent to require a form of subjective good faith inconsistent with the communication of information known to be false.

The concluding sentence of section 43.8 provides additional support for this interpretation. It states: "The immunities afforded by this section and by Section 43.7 shall not affect the availability of any absolute privilege which may be afforded by Section 47." If section 43.8 itself conferred an absolute privilege, there would be no reason for legislative concern that the section 43.8 privilege not affect the availability of the absolute privilege under section 47. This legislative concern necessarily implies that the section 43.8 privilege is more limited than the section 47 privilege, or, in other words, that the section 43.8 privilege is qualified rather than absolute.

The legislative history of section 43.8 confirms this view. In 1974, when section 43.8 was being considered for adoption, Senate committee staff provided this analysis of the proposed legislation: "Adequate protection against unwarranted and unlimited defamation of practitioners of the healing arts appears present by the requirement that the communication is privileged only if the following facts exist: [¶] (a) The communication is made to hospitals, hospital medical staff, professional societies, medical and dental schools, or professional licensing boards. [¶] (b) The communication is intended to aid in the evaluation of the qualifications, fitness, or character of a practitioner of the healing arts. [¶] (c) The communication does not represent as true any matter not reasonably believed to be true." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3633 (1973–1974 Reg. Sess.) p. 3, original underscoring.)

Thus, the legislative record shows that, when it first enacted section 43.8, the Legislature understood that the privilege would protect medical practitioners against defamation through its provisions specifying (1) the identity of the entity or organization to whom the communication was made, (2) the subjective purpose or goal of the communicator to help or assist in the evaluation of the practitioner, and (3) a reasonable basis for the communicator's belief in the truth of the information communicated.

The 1990 amendment of section 43.8 removed the last of these protective requirements as an element of the privilege. After the 1990 amendment, in other words, a communicator has no affirmative duty to verify the truth of the information conveyed and will not be required to establish a reasonable basis for believing the information to be true. But the 1990 amendment left in place the requirements that the communication must have been made to one of the listed groups and that the communicator must have acted with the specified intent—that is, the intent "to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner."

The concurring Court of Appeal justice suggested that if the Legislature intended only to remove the duty to verify the truth of the information conveyed, the Legislature could have accomplished that goal merely by deleting the word "reasonably" from the requirement that the communication "does not represent as true any matter not reasonably believed to be true." But a requirement phrased in this way would still require the communicator to have a subjective belief in the truth of the information communicated, thus making the privilege unavailable when the communicator was merely passing on relevant information received from a third party without any basis to believe or disbelieve the information. The Legislature may well have concluded that a privilege conditioned in this way would be too restrictive, and that it would be preferable to require only that the communicator subjectively had the purpose or goal to help the evaluation by providing available information that could bear on the medical provider's qualifications, fitness, character, or insurability.

■ We have reviewed the legislative record for the 1990 amendment of section 43.8, and we find in it no indication that the Legislature intended that section 43.8 as amended would afford an absolute privilege that would immunize the communication of knowingly false and defamatory statements about a medical practitioner. To the contrary, a Senate committee analysis affirmed that "[i]t is obviously in the public interest to encourage reports of professional malfeasance by immunizing individuals from any liability for communicating *in a truthful, non-malicious manner*." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2375 (1989–1990 Reg. Sess.) p. 11, italics added.) Another Senate committee staff analysis stated that the 1990 amendment to section 43.8 would "[i]ncrease immunity protection" (Sen. Com. on Business and Professions, Analysis of Sen. Bill No. 2375 (1989–1990 Reg. Sess.) p. 5), but, significantly, it did not say that the amendment would make the privilege absolute.

We note that the legislative record for the 1990 amendment of section 43.8 contains at least three letters, including one from the Medical Board of California, asserting that the amendment would make section 43.8's privilege

absolute. But the lack of support for this interpretation from any source within the Legislature itself confirms the Court of Appeal's conclusion that these letters state the views of the writers, not the intent of the Legislature. Therefore, the letters have no persuasive value for our interpretation of the statute. (See *In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39, 47, fn. 6 [99 Cal.Rptr.2d 278, 5 P.3d 839] ["There is no basis for an assumption that such letters reflect legislative intent."].)

 Reading section 43.8 as establishing an absolute privilege would be contrary to canons of statutory construction because it would render meaningless the statutory language requiring that the communication be "intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner." (*Ibid.*) Although these words do not require that the communication actually assist the receiving party in evaluating the doctor's "qualifications, fitness, character, or insurability," they do require that the communicator make the communication with a particular subjective intent. Because false information of any sort has no value in evaluating a medical practitioner, the communication of information known to be false cannot be intended to help or assist in that evaluation, or, in other words, an intent to deceive is inconsistent with an intent to aid. Thus, proof that the communicator knew the information to be false when it was conveyed establishes malice sufficient to defeat the qualified section 43.8 privilege.

Mercy and the amici curiae who have jointly submitted a brief in support of Mercy offer various policy arguments to persuade us that an absolute privilege is better than a qualified privilege in the situation that section 43.8 addresses. They agree with the assertion of the Court of Appeal in *Johnson* that, unless communicators are given an absolute privilege, "the threat of being sued . . . would deter all but the most fearless . . . [and] the Boards' disciplinary activities would soon grind to a halt." (*Johnson, supra,* 25 Cal.App.4th at p. 1570.) On the other side, plaintiff argues that, as a matter of policy, a qualified privilege is better than an absolute privilege because it deters malicious conduct that causes real injury to medical professionals while still providing immunity for communications made in good faith. Plaintiff also points out that although some absolute privileges may be defended on the basis that the injured person has alternative remedies (see, e.g., *Silberg v. Anderson* (1990) 50 Cal.3d 205, 218–219 [266 Cal.Rptr. 638, 786 P.2d 365]), there are no alternative remedies, civil or criminal, for injurious communications made in the context addressed by section 43.8. These competing policy arguments are "best directed to the Legislature, which can study the various policy and factual questions and decide what rules are best for society." (*Carrisales v. Department of Corrections* (1999) 21 Cal.4th 1132, 1140 [90 Cal.Rptr.2d 804, 988 P.2d 1083].) Our task here is to construe the statute as it is now written.

■ For the reasons given above, we conclude that when the Legislature amended section 43.8 in 1990, it did not intend to change the privilege from a qualified to an absolute privilege.[4]

CONCLUSION

Having considered the text of section 43.8, its legislative history, and related provisions of the Civil Code, we conclude: (1) Entities as well as natural persons may claim the section 43.8 privilege, and (2) the privilege is not absolute but instead may be defeated by proof that the person or entity asserting the privilege, when it made the communication, knew the information was false or otherwise lacked a good faith intent to assist in the medical practitioner's evaluation.

The judgment of the Court of Appeal is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**BROWN, J.,** Concurring and Dissenting.—I agree with the majority that the privilege conferred on *persons* by Civil Code section 43.8 (hereafter all statutory references are to the Civil Code) applies to entities as well as humans. However, I disagree with the majority's conclusion that section 43.8 provides only qualified immunity.

The purpose of the 1990 amendment was to increase the immunity conferred by section 43.8, as the majority acknowledges. (Maj. opn., *ante,* at p. 719.) "As originally enacted in 1974, the section 43.8 privilege was qualified rather than absolute. (See *Hackethal v. Weissbein* (1979) 24 Cal.3d 55, 60 [154 Cal.Rptr. 423, 592 P.2d 1175]; *Dorn v. Mendelzon* [(1987)] 196 Cal.App.3d [933,] 943 [242 Cal.Rptr. 259]; see also *Moore v. Conliffe* (1994) 7 Cal.4th 634, 671 [29 Cal.Rptr.2d 152, 871 P.2d 204] (dis. opn. of Baxter, J.).) Before it was amended in 1990, section 43.8 read: '[T]here shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person on account of the communication of information in the possession of such person to any hospital [or] hospital medical staff . . . when such communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing or veterinary arts *and does not represent as true any matter not reasonably believed to be true.*' (As amended by Stats. 1983, ch. 1081, § 2, pp. 3864–3865, italics added.) Thus, before the 1990 amendment, the privilege was expressly conditioned on the communicator's reasonable belief in

---

[4] To the extent they are inconsistent with this conclusion, the decisions in *Johnson v. Superior Court, supra,* 25 Cal.App.4th 1564, *Axline v. Saint Joseph's Hospital and Health Center, supra,* 63 Cal.App.4th 907, and *Alexander v. Superior Court, supra,* 5 Cal.4th 1218, are disapproved.

the truth of the information conveyed. The 1990 amendment removed the above italicized language expressly imposing this condition. (Stats. 1990, ch. 1597, § 30, p. 7697.)" (Maj. opn., *ante*, at p. 719.)

The issue before us, as the majority states, is "whether, by removing from section 43.8 the words 'and does not represent as true any matter not reasonably believed to be true,' the Legislature intended to make the privilege absolute, or whether the privilege is still qualified in light of the remaining requirement that the communication must have been 'intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner . . . .' " (Maj. opn., *ante*, at p. 719.)

The majority concludes the section 43.8 privilege remains qualified. "Because false information of any sort has no value in evaluating a medical practitioner, the communication of information known to be false cannot be intended to help or assist in that evaluation, or, in other words, an intent to deceive is inconsistent with an intent to aid. Thus, proof that the communicator knew the information to be false when it was conveyed establishes malice sufficient to defeat the qualified section 43.8 privilege." (Maj. opn., *ante*, at p. 723.)

The crucial misstep in the argument the majority makes in support of its conclusion is assuming that *intended*, as used in section 43.8, refers to the intent of the person providing the communication. (Maj. opn., *ante*, at p. 720.)

The Legislature was, instead, referring to the *intent of the hospital or hospital staff* in soliciting the communication, namely, that the information is being sought to aid in an evaluation of a practitioner's fitness, character, or insurability. That is what Justice Hull was driving at in his concurring and dissenting opinion below. "[T]he words refer to and describe the nature and subject matter of the proceedings in which the communication is made, not the state of mind of the communicator."

The validity of this construction is demonstrated by *Dorn v. Mendelzon, supra*, 196 Cal.App.3d 933 (*Dorn*). In *Dorn*, the plaintiff sued for defamation, among others, a hospital administrator named Manley. The plaintiff had applied for staff privileges at Centinela Hospital Medical Center (Centinela). Learning of a Board of Medical Quality Assurance report with regard to the restriction of plaintiff's staff privileges at Broadway Hospital (Broadway), the Centinela credentials committee wrote a letter of inquiry to Manley, who was the administrator of a hospital that had purchased Broadway's assets. It was Manley's response to Centinela that the plaintiff claimed to be defamatory. Because of the context in which Manley made the challenged communication, the Court of Appeal held that the then qualified privilege applied. "The

Manley letter was certainly intended to aid in the evaluation of plaintiff's qualifications, and plaintiff does not contend otherwise. In fact, the letter was solicited by Centinela's credentials committee for the *purpose* of assisting its consideration of plaintiff's application for staff privileges. Thus, the qualified immunity for communications evaluative of medical practitioners set forth in section 43.8 is applicable." (*Dorn*, at p. 944.)

"The Legislature, of course, is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof. (*People v. Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288].) Where a statute is framed in language of an earlier enactment on the same or an analogous subject, and that enactment has been judicially construed, the Legislature is presumed to have adopted that construction. (*Union Oil Associates v. Johnson* (1935) 2 Cal.2d 727, 734–735 [43 P.2d 291].)" (*People v. Harrison* (1989) 48 Cal.3d 321, 329 [256 Cal.Rptr. 401, 768 P.2d 1078].) Therefore, the Legislature, in amending section 43.8, must be presumed to have had *Dorn* in mind, and to have understood, consistent with *Dorn*, that the phrase *intended to aid* referred to the intent in soliciting the communication, not the intent in providing it.

The majority seeks support for its interpretation in the final sentence of section 43.8, which states: "The immunities afforded by this section and by Section 43.7 shall not affect the availability of any absolute privilege which may be afforded by Section 47." "If section 43.8 itself conferred an absolute privilege," the majority argues, "there would be no reason for legislative concern that the section 43.8 privilege not affect the availability of the absolute privilege under section 47. This legislative concern necessarily implies that the section 43.8 privilege is more limited than the section 47 privilege, or, in other words, that the section 43.8 privilege is qualified rather than absolute." (Maj. opn., *ante*, at p. 721.)

The majority has misconstrued the significance of the final sentence of Civil Code section 43.8. This is demonstrated by the fact that Business and Professions Code section 2318 , which clearly creates absolute immunity, concludes with the same sentence.

Business and Professions Code section 2318 provides: "In addition to any immunity afforded by Sections 43.8 and 47 of the Civil Code, if applicable, any person, including, but not limited to, a physician and surgeon, hospital, health facility as defined in Section 1250 of the Health and Safety Code, nursing home, convalescent home, peer review body as defined in Section 805, medical society, professional association, patient, nurse, or other healing arts licensee who provides information to the board, to the California Board of Podiatric Medicine, or to the Department of Justice indicating that a board

licensee may be guilty of unprofessional conduct or may be impaired because of drug or alcohol abuse or mental illness, shall not be liable for any damages in any civil action on account of the communication of that information to the board. The immunities afforded by this section shall not affect the availability of any absolute privilege which may be afforded by Section 47 of the Civil Code." (Stats. 1990, ch. 1597, § 22, pp. 7694–7695.)

Civil Code section 43.8 was amended (Stats. 1990, ch. 1597, § 30, p. 7697) and Business and Professions Code section 2318 was enacted (Stats. 1990, ch. 1597, § 22, pp. 7694–7695) by Senate Bill No. 2375 (1989–1990 Reg. Sess.). They were elements of a comprehensive reform of California's system of discipline against medical practitioners, a system the Legislature declared to be "inadequate to protect the health, safety, and welfare of the people of California against incompetent or impaired physicians." (Stats. 1990, ch. 1597, § 1, p. 7683.) The immunity provided by Business and Professions Code section 2318 is clearly absolute: "[A]ny person . . . who provides information to the board . . . indicating that a board licensee may be guilty of unprofessional conduct or may be impaired . . . shall not be liable for damages in any civil action on account of the communication of that information to the board." And yet, like the final sentence of Civil Code section 43.8, the final sentence of Business and Professions Code section 2318 provides that the immunities afforded by it "shall not affect the availability of any absolute privilege which may be afforded by Section 47 of the Civil Code."

Finally, the majority fails to give sufficient weight to the important public policy served by according witnesses an absolute privilege against defamation actions, namely, that such a privilege is established, not for the benefit of witnesses, but for that of the public and the advancement of the administration of justice, to prevent witnesses from being deterred from coming forward and testifying to the truth by the fear of having actions brought against them. (*Hackethal v. Weissbein* (1979) 24 Cal.3d 55, 65 [154 Cal.Rptr. 423, 592 P.2d 1175] (dis. opn. of Tobriner, J.).) The majority summarily dismisses this consideration, saying that competing public policy arguments are best resolved by the Legislature. (Maj. opn., *ante*, at p. 723.) I agree in principle, of course, on the Legislature's primacy in such matters. My concern is that the Legislature has already made its decision on this question, in favor of absolute immunity, and that we are failing to implement it.